**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No.: 1:12-cr-1 (WLS) |
| | : | |
| ELBERT WALKER JR., DARRYL | : | |
| BURK, and SHIRLEY DENISE BURK, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

Pending before the Court are Defendant Elbert Walker Jr.'s Motion for Judgment of Acquittal, made orally on November 18, 2015 and supported by a written brief filed on December 11, 2015 (Doc. 268), Defendant Darryl Burk's Motion for Judgment of Acquittal, made orally on November 18, 2015 and supported by written brief filed on December 11, 2015 (Doc. 269), and Defendant Shirley Burk's Motion for Judgment of Acquittal, made orally on November 18, 2015 and not supported by a written brief. All three Defendants initially moved for judgment of acquittal at the close of the Government's case-in-chief, and the Court reserved ruling on the motions, proceeded with trial, and submitted the case to the jury.[1]

The jury returned a verdict finding Defendant Walker guilty as to all counts and finding that Walker engaged in a conspiracy to commit all of the objects alleged in Count One of the Second Superseding Indictment (hereinafter the Indictment). The jury found Defendant Darryl Burk guilty as to Count One and found that he engaged in a conspiracy to commit mail fraud only. The jury found Defendant Shirley Burk guilty of Count One and found that she engaged in a conspiracy to commit arson, mail fraud, and false declarations to a court. The Parties were provided the opportunity to submit written briefs in support of their motions for judgment of acquittal following the verdict. Defendants Elbert Walker and Darryl

---

[1] The Court herein refers to Defendants Darryl Burk and Shirley Burk as their names are written in the Indictment except where the Court cites to evidence presented at trial that lists their names with different spellings.

Burk submitted written briefs (Docs. 268, 269), to which the Government responded briefly. (Docs. 271, 273.) For the reasons that follow, all three Defendants' Motions for Judgment of Acquittal (Docs. 268, 269) are **DENIED**.

## I.      Judgment of Acquittal Standard

Under Federal Rule of Criminal Procedure 29, a defendant's motion for judgment of acquittal should be granted if the Court finds that "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Thus, the Court "must determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999)).  The conviction must be upheld unless the Court finds that "the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Jimenez*, 705 F.3d 1305, 1308 (11th Cir. 2013) (citing *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008)).

In construing the evidence, the Court must view the evidence in the light most favorable to the Government.  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing *United States v. Futrell*, 209 F.3d 1286, 1288 (11th Cir. 2000)).  Accordingly, the Court must "resolve any conflicts in favor of the Government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict." *Id.* (citing *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) and *Ward*, 197 F.3d at 1079).  "The prosecution need not rebut all reasonable hypotheses other than guilt." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (citing *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982)).  Thus, "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *Thompson*, 473 F.3d at 1142 (citing *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990)).  If, as it did here, the Court reserves decision on the motion made at the close of the Government's evidence, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).

## II.    Count One Conspiracy Charge against All Defendants

All three Defendants were charged and convicted under Count One of the Second Superseding Indictment. The Court notes that the jury's special verdict varied as to each Defendant. On the verdict form, the jury noted its findings as to which alleged objects of the conspiracy it found each Defendant conspired to commit. The jury found that Elbert Walker conspired to commit all seven alleged objects of the conspiracy. The jury found that Darryl Burk conspired to commit only mail fraud and that Shirley Burk conspired to commit arson, mail fraud, and false declarations to a court of the United States. (Doc. 264.)

### A. Elements of the Conspiracy Count

In Count One, the Government charged Defendants Walker, Darryl Burk, and Shirley Burk with conspiring to commit seven illegal objects: arson, mail fraud, wire fraud, bankruptcy fraud, possession of a forged security and implement for making a forged security, bank fraud, and false declarations before a court. The following are the elements of the conspiracy and illegal objects charged in Count One.

First, the Government charged the Defendants with conspiring to commit bank, mail, and wire fraud in violation of 18 U.S.C. § 1349, together with §§ 1341, 1343, and 1344 (Doc. 44 at 3.) "To sustain [a] conspiracy conviction under 18 U.S.C. § 1349, the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (citing *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)).

The Court notes that, without objection from any Party, it instructed the jury that proof of an overt act was required as to all of the unlawful objects. (Doc. 262 at 11-12.) Though the Government requested the appropriate charges as to each type of conspiracy, no Party objected to this instruction during the charge conference, after the Court concluded charging the jury, or at any time during the trial or post-trial. For reasons that follow, the Court finds that a reasonable jury could have found overt acts in furtherance of the § 1349 conspiratorial objects, even though overt acts were not required to be proven, and that any error in instructing the jury that an additional element was required to be proven ultimately weighed in the Defendants' favor. *United States v. Diaz*, 190 F.3d 1247, 1253 (11th Cir. 1999)

("In the best case scenario for the defendant, the jury would have been instructed to find an additional element not necessary to the verdict of guilty. There was sufficient evidence in this record to support such a finding . . . The defendant could show no harm from the erroneous instruction as to this additional element."). Furthermore, the Supreme Court recently considered a case where a jury was erroneously instructed, without objection, that an additional element was required for a conviction. The Court held, "[W]hen a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Musacchio v. United States*, No. 14-1095, slip op. at 5, 577 U.S. ___ (Jan. 25, 2016). For the reasons that follow, this Court also holds that any rational trier of fact could have found that all of the elements of the *charged* § 1349 conspiracy were proven beyond a reasonable doubt.

The Court also notes that one of the conspiracy statutes charged, 18 U.S.C. § 1349, was not enacted until 2002, six years after the Count One conspiracy was alleged to have begun. No Party has taken up the issue of retroactivity at any point during this case, and the Court does not herein address it because the Court, for the reasons that follow, finds sufficient evidence to support a finding that a § 1349 conspiracy to commit mail fraud, as to Shirley Burk and Darryl Burk, and mail, wire, and bank fraud, as to Elbert Walker, existed after the enactment of § 1349.

"[T]he elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical." *United States v. Ward*, 486 F.3d 1212, 1221-22 (11th Cir. 2012) (citing *Beck v. Prupis*, 162 F.3d 1090, 1095 & n.9 (11th Cir. 1998)). "Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or causes the use of the mails or wires for the purpose of executing the scheme or artifice." *Id.* at 1222 (citing *United States v. Hewes*, 729 F.2d 1302, 1320 (11th Cir. 1984); *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003)). Both offenses also require "proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence." *Hasson*, 333 F.3d at 1270-71 (citations omitted). Furthermore, neither offense requires "[p]roof of specific intent to use

the mails or wire[s]"; rather, they require only proof that the defendants "agreed to engage in a scheme to defraud in which they contemplated that the mails [or wires] were likely be used." *United States v. Ross*, 131 F.3d 970, 981 (11th Cir. 1997) (citing *United States v. Massey*, 827 F.2d 995, 1001-02 (5th Cir. 1987)).

Under 18 U.S.C. § 1344, a person is guilty of bank fraud if he "knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution" or "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. The types of financial institutions protected by § 1344 are listed at 18 U.S.C. § 20 and include banks or credit unions insured by the Federal Deposit Insurance Corporation and mortgage lending businesses or entities that make in whole or in part federally related mortgage loans. The Court notes, however, that the jury was instructed, without objection from any Party, that a financial institution includes only "any bank or savings association the deposits of which are insured by the Federal Deposit Insurance Corporation" and was not instructed that mortgage lenders may also be financial institutions. (Doc. 262 at 21.)

In Count One, the Government also charges the Defendants with conspiring to commit bankruptcy fraud, 18 U.S.C. § 152(3), possession of forged security or implement for making a forged security, 18 U.S.C. § 513, and false declarations to a court, 18 U.S.C. § 1623 in violation of 18 U.S.C. § 371. To prove conspiracy under § 371, the Government must establish beyond a reasonable doubt "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." *United States v. Jordan*, 582 F.3d 1239, 1246 (11th Cir. 2009) (quoting *United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998)).

Under 18 U.S.C. § 152(3), a person is guilty of bankruptcy fraud if he "knowingly or fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury" in relation to a federal bankruptcy proceeding. Under § 513, a person can be guilty of possessing a counterfeit or forged security or implement for making a counterfeit or

forged security if he does so with the intent to defraud. The Court instructed the jury on the definitions of "counterfeit," "forged," "security," and "organizations." (Doc. 262 at 18-19.)

The elements of making false declarations to a court in violation of § 1623 are: (1) "the declarant must be under oath," (2) "the testimony must be given in a proceeding before a court of the United States," (3) the declarant must knowingly make (4) a false statement, and (5) "the testimony must be material." *United States v. Whimpy*, 531 F.2d 768, 770 (5th Cir. 1976).[2]   A person is guilty of making false declarations to a court of the United States if he or she makes a false material declaration in any proceeding before a federal court or grand jury. This provision does not encompass false declarations made in state court or state grand jury proceedings. *See Dunn v. United States*, 442 U.S. 100, 107 (1979) (explaining that § 1623 was passed by Congress "to facilitate perjury prosecutions and thereby enhance the reliability of testimony before *federal* courts and grand juries" (emphasis added)).

Finally, the Indictment charged the Defendants with conspiring to commit arson in violation of 18 U.S.C. § 844(i) and (n). It is a crime to conspire to maliciously damage or destroy, or attempt to damage or destroy, "by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." § 844(i). As with conspiracies charged under § 1349, the Government must prove "(1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *Moran*, 778 F.3d at 960. Section 844(n) does not require proof of an overt act. *Compare United States v. Ghailani*, 761 F.Supp.2d 167, 188 n.189 (S.D. N.Y. 2011) and *United States v. Dougherty*, 98 F.Supp.3d 721 (E.D. Penn. 2015) (holding that no proof of an overt act is required under § 844(n)), with *United States v. Smith*, 406 F. App'x 453, 453 (11th Cir. 2010) (affirming a defendant's conviction for conspiracy to commit arson where the jury was instructed that proof of an overt act was required but where the defendant's objections to the jury instructions were not specifically directed at the overt act instruction). As the Court has already noted, it instructed the jury, without objection from any Party, that proof of an overt act was required as to all of the alleged conspiratorial objects.  For reasons that follow, the Court finds that a reasonable jury

---

[2] The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc).

could have found overt acts in furtherance of the § 844(n) arson object, even though an overt act was not required to be proven, and that any error in instructing the jury that an additional element was required to be proven ultimately weighed in the Defendants' favor. *Diaz*, 190 F.3d at 1253.

Generally, the Government may prove a conspiracy with circumstantial evidence alone "[b]ecause the essential nature of conspiracy is secrecy." *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998). Further, because the essence of an illegal conspiracy is the agreement to commit an unlawful act, the Government need not prove that a defendant was successful in carrying out the illegal object of the conspiracy. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975).

**B. The Evidence Presented at Trial**

The vast majority of the evidence presented during the course of the four-week trial in this case related to Count One. In considering each Defendant's motion as to Count One, the Court does not herein attempt to recount comprehensively four weeks' worth of evidence presented during the Government's case-in-chief; instead, the Court will provide examples of evidence presented by the Government that it finds to be sufficient (or insufficient), together with all the other evidence presented in the Government's case-in-chief, to sustain convictions on each of the charges in the Indictment. As the Government did in the Indictment, the Court herein organizes the evidence presented as it relates to what the Court finds to be eight endeavors involving related actions and schemes.

*1. The 1996 to 1997 1097 Bondvilla Drive Bankruptcy Filing, Insurance Policy, and Fire*

Through documents admitted during Agent Steve Sprouse's testimony, the Government proved that in 1996, Elbert Walker sold a home located at 1097 Bondvilla Dr., Cairo, Georgia to Eddie Dixon. At trial, Veronica Harper testified that she and Eddie Dixon lived at 1097 Bondvilla Drive in 1996. Harper testified that she participated in a sworn deposition in relation to a fire that occurred at the property and that Eddie Dixon told her what to say at the deposition.

The Government called Richard Wallace who worked for State Farm Insurance in 1996. Through Wallace's testimony, the Government introduced an application for insur-

ance coverage, dated November 6, 1996, for 1097 Bondvilla Drive in the name of Eddie Dixon as well as a proof of loss inventory sheet that was submitted via U.S. mail in connection with a fire loss claim. The Government introduced an estimate from Northside Home Remodeling, a company owned by Elbert Walker and for which Darryl Burk worked, for repairs of the 1097 Bondvilla Drive property. The Government also introduced a letter from State Farm to Eddie Dixon, dated October 10, 1997, that stated that Dixon's claim had been denied because an investigation revealed that the fire at the property was intentionally set. Agent Sprouse also testified that a copy of the transcript of Harper's sworn statement and a document from State Farm regarding 1097 Bondvilla Drive were found during a search of Elbert Walker's residence at 412 Bay Tree Road, Cairo, Georgia.

### 2. *The 2000 410 Oak Street Insurance Policy and Fire*

Through the testimony of Cassandra Montgomery, who was formerly employed by Monroe Pogue Insurance Agency in Pelham, Georgia, the Government introduced documentation that Elbert Walker held an insurance policy through the agency on the hosuse located at 410 Oak Street, Thomasville, Georgia and 1097 Bondvilla Drive and that on December 4, 2000, Elbert Walker reported a fire loss at 410 Oak Street. Ms. Montgomery testified that she assisted Walker with applying for insurance coverage on the properties and that she faxed Walker's fire loss claim relating to the 410 Oak Street fire to the insurer's central office.

During the search of Elbert Walker's residence at 412 Bay Tree Road, agents seized a transcript of a May 2, 2002 sworn statement Shirley Burk gave in connection with her insurance claim for the fire that occurred at 1097 Bondvilla Drive on or about January 1, 2002. In the sworn statement, Shirley Burk stated that she lived at the Oak Street property and had a fire loss there in 1999 and that she rented the property from Elbert Walker.

### 3. *The SGE Mortgage Funding Corporation Payoff of 1097 Bondvilla Drive and 410 Oak Street, Forged Check, and Related 2009 Federal Lawsuit*

The Government called Hal Worley, who testified that he worked as an insurance adjuster and handled Elbert Walker's claim for the 2000 fire loss at 410 Oak Street. During Worley's testimony, the Government introduced a check dated April 30, 2001 for $45,000

8

from Essex Insurance Company payable to Elbert Walker *and* SGE Mortgage Funding Corporation. Worley testified that he could not remember what he did with the check once he received it from the insurance company but said that his normal procedure would be to hand deliver or mail it to the insured parties.

The Parties stipulated to the introduction of a sworn statement from Carol Ratliff, a former owner of the store Sign Outlet. Ratliff's statement said that she had no independent recollection of the purchase of a stamp but that she had provided to law enforcement Government's Exhibit D-1-c-2, a record kept in the regular course of Sign Outlet's business. Government's Exhibit D-1-c-2 is a packing slip from Sign Outlet for the purchase of a rubber stamp on May 3, 2001. The packing slip contains a stamp reading "SGE Mortgage Funding Corp." It does not contain a customer's name or phone number as Ratliff's sworn statement says it does. However, Agent Stan Buress testified that after initially denying it, Darryl Burk admitted to buying a stamp at the direction of a man named Benjamin Norwood but later again denied doing so.

The Government's witness M. Kirby Wood testified that when he was a practicing attorney, Elbert Walker was a client of his. He testified that in May 2001, Elbert Walker approached Mr. Wood about settling a debt of $15,000 Walker owed Wood (who was liquidating his practice at the time due to disbarment). Walker brought the $45,000 check from Essex Insurance, and Wood testified that the check had SGE Mortgage Company's stamp on the back. Wood testified, and the Government showed through evidence of various checks from Wood to Elbert Walker and from Wood to another account he held, that Wood handled the deposit and disbursement of the check funds, keeping some for himself and distributing the rest to Elbert Walker.

The Government then called John Kennedy, an attorney who acted as receiver for SGE Mortgage. Kennedy testified that he learned the $45,000 had been negotiated without SGE's authorization. During Kennedy's testimony, the Government introduced another Essex Insurance check with what Kennedy testified was SGE's actual corporate stamp as a comparator to the stamp on the Essex Insurance check Elbert Walker presented to Kirby

Wood. Kennedy executed a sworn affidavit of fraudulent transaction in order to recover the $45,000. A replacement check was issued on August 20, 2001 to SGE alone.

John Kennedy also testified that on February 20, 1998, Elbert Walker took out a $45,000 mortgage with SGE on 1097 Bondvilla Drive and 410 Oak Street. Kennedy testified that he received notice that Elbert Walker filed bankruptcy on March 25, 2005, which stayed SGE's foreclosure proceedings. Kennedy testified that SGE's collections on Walker's mortgage had been stayed previously due to an earlier bankruptcy filing by Walker, which was dismissed on June 8, 2004.

According to Kennedy, Elbert Walker contacted him in 2006 regarding the payoff amount on the SGE mortgage on 1097 Bondvilla Drive. Kennedy testified that though the payoff amount was greater, he agreed to accept $27,000 to satisfy the outstanding debt. Kennedy then testified that Elbert Walker filed suit against Kennedy, SGE, and Hall, Bloch, Garland, and Meyer, Kennedy's law firm. Kennedy read into the record a portion of a transcript of a related hearing before United States District Court Judge Hugh Lawson. Walker testified before Judge Lawson that Kirby Wood deposited the $45,000 into his account and then payment on the check was stopped and another check was issued. When asked by Judge Lawson if he received a $45,000 check from the insurance company and cashed it, Walker responded "No, sir." (Gov't Ex. D-1-d-3 at 15.)

### 4.   *The 2001 1097 Bondvilla Drive Insurance Policy and Fire*

In the sworn statement introduced during Agent Sprouse's testimony, Shirley Burk stated that prior to 2002 she rented the home at 1097 Bondvilla Drive from Elbert Walker. Shirley Burk also stated that on November 2, 2001, she applied for insurance on the property. Mary Tillman, who worked for Insurance Services of the South in Moultrie Georgia, testified that she assisted Shirley Burk in completing the insurance coverage application and that Shirley Burk signed the application stating that she had never had a policy declined or cancelled and that she had no prior fire losses in the last three years. As the Court has already noted, the Government introduced a sworn statement by Burk in which she stated that she lived at 410 Oak Street during a fire loss that occurred in 1999. Tillman also testified that Shirley Burk was sent a notice that her policy would be cancelled for failure to pay, effective

January 4, 2002, which would have been just three days after the fire that occurred at the property around January 1, 2002.

On January 9, 2002, Government expert witness Charles Shotwell, a former fire investigator for Crawford Investigation Services, investigated a fire that occurred at 1097 Bondvilla Drive. Shotwell testified that he submitted for laboratory analysis samples taken from the attic, where he concluded the fire originated. Another expert, Dennis Akin testified that he conducted the laboratory testing of the debris samples and concluded that the samples contained residue of evaporated gasoline. After receiving the results of the analysis, Shotwell concluded that the fire was intentionally set.

Government witness Farrell Whiddon, a former claims adjustor for Crawford and Company, testified that he handled Shirley Burk's 2002 fire loss claim for Audobon Insurance. During his testimony, the Government introduced Burk's sworn statement in proof of loss and personal property inventory submitted to the claims adjustor. Burk was notified by Crawford, in a letter written by Whiddon, that her claim had been rejected, and on March 26, 2002, Burk mailed a letter to Crawford demanding payment of the claim. Agent Sprouse testified that Farrell Whiddon's business card was seized from Darryl Burk's home at 1390 1st Avenue, Moultrie, Georgia. (Gov't Ex. FA-32.)

5. *The 2001 555 Baggs Ferry Road, Lot 17 Insurance Policy and Fire*

At trial, Government witness Kerrie White testified that on June 14, 2001 she sold a mobile home in the Hamilton Trailer Park located on Lot 17 at 555 Baggs Ferry Road, Camilla, Georgia to Elbert Walker for $1,200. Craig Hamilton, the owner of Hamilton Trailer Park, testified that Darryl Burk contacted him about connecting utilities at the mobile home on Lot 17. He testified that Burk gave him a check dated July 18, 2001 for the lot rental and processing fee that ultimately bounced when he tried to cash it on July 20, 2001. Hamilton also testified that he had contact with Darryl Burk in connection with removing the mobile home from the lot after it was damaged by fire. Hamilton identified Darryl Burk in the courtroom.

Government witness Keysha McIntyre testified that she lived in the Hamilton Trailer Park in 2001 and that her sister Tomeka McIntyre lived in the mobile home next door to

hers. She testified that on July 25 or 26, 2001, she recalled a fire occurring at Tomeka's mo-
bile home. She testified that she heard a whistle and boom sometime during the night and
saw flames coming out of the back of the mobile home. She testified that Tomeka was not
home at the time of the fire. On cross-examination, Keysha McIntyre testified that that she
had no dealings with Darryl Burk and that she understood that Tomeka was allowed to re-
side in the mobile home by Elbert Walker.

Next, Tomeka McIntyre testified that she met Elbert Walker at a night club he
owned. She began working at the club and then began renting the mobile home from Walk-
er. She stated that she did not have any insurance on the mobile home's contents and never
received money from Elbert Walker or Darryl Burk in connection with the fire loss. She also
testified that after the Baggs Ferry fire, Elbert Walker asked her if she would move into a
house in Cairo, Georgia for a few months and then move out so that he could set fire to it
and obtain insurance money. On cross-examination, Darryl Burk's counsel asked Ms. McIn-
tyre if she recalled a written statement she provided to investigators on July 31, 2001 in
which she stated Elbert Walker asked her to reside in a home in Moultrie and then move out
so that he could set the house afire. Ms. McIntyre responded that she only recalled being
asked to move into a home in Cairo.

Then, Salitha McIntyre, sister to Keysha and Tomeka McIntyre, testified that she had
a conversation with Elbert Walker in which he told her to cease talking to law enforcement
about the fire at Tomeka's mobile home and said that if she continued, someone might
throw something in her house and injure her and her young children. Salitha also testified
that she had no dealings with Darryl Burk.

Government witness Bruce Gourley, an agent with the Georgia State Fire Marshal's
Office, testified that he investigated a July 2001 fire that occurred at the mobile home on Lot
17. He testified that a canine unit alerted to fire accelerant in the oven/stove area. He stated
it was his opinion that someone had brought accelerant inside the mobile home.

Finally, with regard to the Baggs Ferry fire, the Government called insurance agent
Adela Ford. During Ms. Ford's testimony, the Government introduced an insurance applica-
tion in Darryl Burk's name for the mobile home at Lot 17, 555 Baggs Ferry Road, dated July

17, 2001. The application states that the mobile home was purchased for $6,500. Ms. Ford testified that the application was transmitted via mail to the insurance company's central office. The Government also introduced a loss report generated by the insurance company after a phone call purportedly made by Darryl Burk reporting a fire "of suspicious origin" at the mobile home.

### 6.  *The 2006 1097 Bondvilla Drive Mortgage, Insurance Policy, and Fire*

The Government called witness Michelle Spooner who worked as a home loan officer. Spooner testified that she spoke with Elbert Walker about assisting Shirley Burk with obtaining a mortgage for 1097 Bondvilla Drive. She testified that, after insisting that she must, she spoke with Shirley Burk by phone and that Burk was eager to close the loan and purchase the home. However, Spooner testified that her communications about the mortgage were mostly with Elbert Walker and that *he* faxed Burk's proof of employment and income and an alternative line of credit letter from J&J Auto Sales (which was located at Darryl Burk's home address). Among the documents faxed by Elbert Walker were paystubs with Shirley Burk's name on them from Mama's Kitchen and from an unnamed employer. Spooner noted an unusual deduction on the paystubs submitted listed as "FITA" in addition to the more-common "FICA" deduction. Spooner testified that she faxed Shirley Burk's loan application to various mortgage companies in February 2006.

Spooner testified about her "Down Payment Assistance" program. In Burk's case, Spooner and others in her office created fraudulent money orders in order to document $5,000 in earnest money that, to Spooner's knowledge, Shirley Burk never paid to Elbert Walker in order to complete the mortgage transaction. Spooner also testified that she had difficulty finding an insurance company to insure the property because of previous damage but that a woman in Thomasville, referred by Elbert Walker, eventually assisted her. Spooner testified that she witnessed Shirley Burk sign the loan packet at the closing and that Shirley Burk read through the closing papers, though she admitted at cross-examination that no attorney was present at the closing, as is required under Georgia law. Spooner testified that a number of liens on the house were paid off with the purchase money and that Walker ultimately received only $617 from the sale of the house.

The Government called witness Rod Williams, who was qualified as an expert in fire investigations and origin determination and also testified as a fact witness. Williams investigated an August 21, 2006 fire at 1097 Bondvilla Drive. Williams testified on cross-examination that the 2006 fire at 1097 Bondvilla originated on a bed. He testified that he collected an iron found on the bed but concluded that it was not the source of the fire's origin but rather a human act was. Government witness Perry Hopkins, an electrical engineer who was qualified as an expert, testified that he analyzed the iron collected from 1097 Bondvilla. Hopkins concluded that the iron did not malfunction in a way that would have caused a fire.

Rod Williams also testified that he interviewed Elbert Walker at the Grady County Sheriff's Office in April 2007. A video of the interview was played for the jury, and the jury was provided a transcript of the interview as an aid. During the interview, Elbert Walker stated that he sold 1097 Bondvilla Drive to Shirley Burk. He discussed the 1997 and 2002 fires at 1097 Bondvilla and said that he had put in a repair bid on behalf of his company Northside Home Remodeling after the second fire. Walker stated that he was not aware of any other fires that had occurred at the residence. However, during the testimony of Rhett Maige, a claims adjustor for Foremost Insurance who handled Burk's claim for the 2006 fire loss at 1097 Bondvilla, the Government introduced a repair quote from Northside Home Remodeling that was submitted by mail along with Burk's sworn statement of loss. (Gov't Ex. D-1-f-8.) Maige testified that he received a letter dated October 18, 2006 sent via mail from Burk, demanding payment for her fire loss claim.

### 7. The 2006 605 S. Harney Street Mortgage and Bankruptcy Filing

Loan officer Michelle Spooner also testified that, at the request of Elbert Walker, she assisted Angel Mickens in purchasing a home at 605 S. Harney Street, Camilla, Georgia in 2006. The Government introduced a certified court record evidencing the transfer of 605 S. Harney Street from Jessie Brinner to Bridget Harrison. Spooner testified that Bridget Harrison is Elbert Walker's daughter. Spooner testified that she created fraudulent money orders in the same way she had for Shirley Burk's closing to evidence Angel Mickens' payment of the earnest money since Mickens did not have the money to pay it. She testified that Mickens' loan application included documentation that she worked at Southside Mini Mart (also

14

known as South Side Grocery, as the evidence showed), a business owned by Elbert Walker and a letter from J&J Rental signed by Elbert Walker stating that Mickens had been a tenant. Spooner noted the unusual "FITA" deduction on the Southside Mini Mart paystub that she had also noted on Shirley Burk's Mama's Kitchen paystub. Mickens' loan closing documents were signed and dated March 31, 2006.

Angel Mickens (now Vicks) also testified for the Government. She identified Elbert Walker in court and testified that she purchased the S. Harney Street home from Elbert Walker. She testified that she worked at Southside Grocery as well as the Equity Group poultry plant. She testified that she did not recall paying rent to J&J Rental or Elbert Walker.

Mickens testified about a universal note signed by her, dated August 21, 2006, stating that Mickens owed Bridget Harrison $29,000 for the purchase of the Harney Street home. On cross-examination, Mickens stated that she did not understand what the universal note signified or that she was borrowing $29,000 from Harrison. The loan closing documents generated for the sale of 605 S. Harney Street did not make reference to this universal note or the $29,000 amount.

Mickens also testified that she only made one payment on the mortgage and when she became unable to make her mortgage payments, she purchased a bankruptcy filing kit from an office supply store with pre-printed forms. She said that she filled out part of the kit but left it in Elbert Walker's truck one day when he gave her a ride home from her job at Southside Grocery. She said she never inquired with Walker about the kit. The bankruptcy documents were admitted into evidence and Mickens testified that some of the writing was in her handwriting but some of it was not, though the debts recorded were accurate. "1994 EZ Legal Forms" was printed at the bottom of the bankruptcy kit forms; the forms matched bankruptcy forms bearing Elbert's wife, Mildred Walker's name, dated 1999, that were seized from Walker's residence. Mickens testified on re-direct that eventually the 605 S. Harney Street home was foreclosed upon.

### 8.   The 2006 608 Oak Circle Insurance Policy, Fire, and Counterfeit Check

Rod Williams testified that he investigated a November 9, 2006 fire at 608 Oak Circle. During his investigation, Williams learned that Ernest Rogers was the tenant at the

house. Williams testified on cross-examination that the 2006 fire originated on a couch. Williams testified that he collected a table lamp that had apparently been placed on the couch and submitted it for analysis. Perry Hopkins, an electrical engineer who was qualified as an expert, testified that he analyzed the table lamp collected from 608 Oak Circle. Hopkins concluded that the table lamp's switch was in the off position and that though there had been alterations made to the electrical cord, the damage to the cord appeared to have resulted from an "external heat attack." Williams noted during his testimony that he observed the sheet rock above the couch appeared to have been cut out prior to the fire, which he believed was significant since fire is sustained by oxygen flow.

Kenneth Hannon, a Moultrie Fire Department firefighter, testified that he responded to a fire at 608 Oak Circle in 2006. He then testified that when he returned to the scene four or five days later, he saw Ernest Rogers, Roslyn Fletcher, and Mildred Walker. He witnessed Mildred taking notes on a notepad. When shown a photograph of two men apparently doing repair work together, which was admitted during Rod Williams' testimony, Hannon identified Ernest Rogers as the man standing on the roof and Elbert Walker as the man on the ladder.

The Government called Donna Butterworth, a claims adjustor for Southern General underwriters, who testified that she was involved with Ernest Rogers' claim for a fire loss that occurred at 608 Oak Circle. During her testimony, the Government introduced a sworn statement in proof of loss, dated December 4, 2006 and signed by Rogers. A repair quote from Northside Home Remodeling was submitted along with it. Butterworth testified that she likely received the documents via mail. She also testified that she received a letter from Rogers on December 7, 2006 stating that the $1,000 payment he had received from Southern General was insufficient.

The Government called Darrell Plymel, owner of Plymel Package store in Moultrie, Georgia. Plymel testified that his business cashed checks for a one percent fee. He testified that Ernest Rogers came to his package store with a check dated October 20, 2008 that appeared to be from Foremost Insurance Company in the amount of $24,689.42 and reading "Fire Loss." Plymel testified that the check was a bad check and did not clear. Attorney

Ronald Bruce Warren testified that Shirley Burk was a client of his and that he handled the disbursement of a check for $22,000 from Foremost Insurance Company to her and the law firm dated January 29, 2008. That check also read "Fire Loss."

### C. Analysis

#### 1. *Whether a Reasonable Jury Could Find Proof of a Single, Unified Conspiracy as Alleged*

The Government's theory of this case is that over a nearly fourteen-year period, a single, unified conspiracy existed between Elbert Walker and a number of other individuals, including Darryl and Shirley Burk, to obtain money unlawfully by transferring property between one another, obtaining mortgages and insurance policies on houses, setting fire to those houses, making insurance claims on the fire losses, and making false statements in bankruptcy and federal district court proceedings in order to further conceal the conspiracy. In its written response to Darryl Burk's Motion, the Government described the conspiracy as a "Shampoo. Rinse. Repeat." conspiracy. In other words, the Government's theory is that the co-conspirators' "intent was to continue to defraud insurance companies, financial institutions and courts with no end in sight." (Doc. 273 at 4.)

Defendants Elbert Walker and Shirley Burk both argued that the Government failed to prove the conspiratorial agreement element. Defendant Darryl Burk argued that, at best, the Government proved multiple different conspiracies existed. Darryl Burk went on to argue that the Government proved only a rimless wheel conspiracy rather than the single, unified conspiracy it charged in the Indictment and that such a variance between the Indictment and the evidence at trial demands acquittal. (Doc. 269 at 2-3.)

First, the Court considers Darryl Burk's argument that the Government at best only proved a rimless wheel conspiracy rather than the single, unified conspiracy charged in the Indictment. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). ("[T]he pattern was that of separate spokes meeting at a common center, though we may add without the rim of the wheel to enclose the spokes. The proof therefore admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment.") (internal quotations omitted)). In *Kotteakos*, the Supreme Court described the danger inherent in indicting a single conspiracy where really multiple, separate conspiracies existed, "The dan-

gers of transference of guilt from one to another across the line separating conspiracies, sub-consciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Id.* at 773-74.

"A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 308 F.3d 193, 203 (4th Cir. 2002). The Eleventh Circuit held in *United States v. Toler*,

> [T]he government must prove the conspiracy it charged in the indictment rather than some other conspiracy. The government must show an "interdependence" among the alleged co-conspirators in order to prove that the indicted conspiracy was a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies.

144 F.3d 1423, 1426 (11th Cir. 1998). And in *United States v. Chandler*, a case Darryl Burk relied on heavily in his argument, the Eleventh Circuit explained, "We have never upheld a conspiracy conviction where a single key man moved alone from spoke to spoke, agreeing with no one else common to more than one spoke." 388 F.3d 796, 808 (11th Cir. 2004). However, even if a defendant's contact "extends to only a few or even one of the co-conspirators," he or she can be found to be a co-conspirator "so long as the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy and the defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt." *Toler*, 144 F.3d at 1427-28.

In order to determine whether a reasonable jury could have found a single conspiracy, the Court considers "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997). The Government must not only prove connections or interdependence between co-conspirators but also, where a single conspiracy is alleged to have multiple illegal objects, that there is some connection between those objects. *Chandler*, 388 F.3d at 809 ("While a single conspiracy may have two illegal objects, without proof of some *connection* between these objects, it is not a *single* conspiracy.").

18

In a case involving a single conspiracy where multiple fraud schemes were charged to be the illegal objects, the Second Circuit found the evidence supported the jury's finding of a single conspiracy for the following reasons:

> (1) all the schemes served the same overriding goal . . . (2) the schemes were led by the same core group of community leaders, including [one of the defendants] and several unindicted co-conspirators; (3) the schemes shared common participants, including the appellants; (4) the frauds were mutually interdependent (e.g., fraudulent documents from one scheme supported the frauds against other agencies); and (5) the conspirators used the same distinctive methods and means in their different frauds. These means and methods included the creation of sham organizations, the submission of fraudulent documentation to establish the eligibility of New Square residents and others to participate in public funding programs, the opening of special bank accounts to collect and conceal fraudulently obtained funds, and the use of nominee names, aliases, and religious organizations to conceal income.

*United States v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000). Similarly, in *Chandler*, the Eleventh Circuit emphasized the connection between the co-conspirators, the individual spokes' knowledge of other spokes, and the overlap of membership between the spokes beyond just a single hub person as examples of evidence establishing a single, unified conspiracy. *See generally Chandler*, 388 F.3d 796.

Here, Darryl Burk attempts to argue that the multiple, separate frauds and other illegal conduct charged were "linked only by the happenstance of common methods of operation and the omnipresence of" Elbert Walker "as mastermind." *Berger*, 224 F.3d at 115. But there are other features linking the charged objects and the co-Defendants, including "their common purpose, overlapping participants, and mutual dependence." *Id.*

Here, the Government's evidence shows a common purpose among the various co-conspirators. That purpose was, as the Government put it, "to defraud insurance companies, financial institutions and courts." (Doc. 273 at 4.) The Court finds that the "Shampoo. Rinse. Repeat." evidence of substantially the same fraud methods used repeatedly by various conspirators demonstrates the co-conspirators' shared purpose. The court in *Berger* found evidence showing that "the conspirators used the same distinctive methods and means in their different frauds," supporting the finding of a single conspiracy. *Id.* In *Berger*, those "means and methods included the creation of sham organizations, the submission of fraudu-

19

lent documentation . . . , the opening of special bank accounts to collect and conceal fraudu-lently obtained funds, and the use of nominee names, aliases, and religious organizations to conceal income." *Id.*

Here, the means and methods were so similar that even the same proof of loss inven-tory forms and bankruptcy filing forms were used. The six home fires alleged in the Indict-ment each followed a similar pattern –the owner or tenant obtained insurance, shortly there-after a fire occurred, and then an insurance loss claim (usually with the same form used in prior fire incidents) was filed. The evidence shows a consistent pattern of the co-conspirators' making false statements in order to obtain insurance, insurance benefits, mort-gages and to avoid foreclosure and prosecution.

Also, the Government's evidence, construed in the light most favorable to the Gov-ernment, shows that the various spokes of the charged conspiracy were intertwined and in-terdependent. Documents related to the various spokes from various points in time were found at Elbert Walker's business and Shirley Burk's place of employment, Southside Gro-cery, Walker's home, and Darryl Burk's home.

Pieces of evidence seized from Darryl Burk's residence at 1390 First Avenue demon-strate the interconnectedness of the spokes, including: a phone bill payment receipt for R&J Furniture, which was owned by Elbert Walker and which Alcohol, Tobacco, and Firearms Agent Thomas Greco testified was used as a storage facility for fire-damaged furniture; a business card for Farrell Whiddon, the Crawford & Co. claims adjustor who handled Shirley Burk's fire loss claim related to the 2002 1097 Bondvilla Drive fire; an undated services esti-mate from Northside Home Remodeling, Elbert Walker's company that submitted repair estimates for several of the fire losses, that says "Ask for Darryl (229) 377-9589" at the top of the page; Zockrock Auto Repair receipts and a business card listing an address 605 S. Harney St., the house Angel Mickens eventually purchased; a business card from Rex Bishop at Georgia Finance, with whom Shirley Burk tried to cash a $3,600 counterfeit check dated December 4, 2006; a business card for Richard Wallace who investigated Eddie Dixon's 1997 State Farm Insurance fire loss claim for 1097 Bondvilla Drive; a receipt for a utilities payment for 1097 Bondvilla in Elbert Walker's name, dated September 13, 2004; a receipt in

Angel Mickens' name dated October 20, 2004; a paystub for Darryl Burks, dated April 16, 2005, from J&J Cleaning & Hauling in Camden, New Jersey that lists "FITA" and "FICA" like the pay stubs submitted in connection with Shirley Burk's and Angel Micken's mortgage applications; a December 16, 2005 letter from Georgia Power to Jessie Brinner, the man who purchased 605 S. Harney Street and then transferred it to Bridget Harrison who then sold it to Angel Mickens; a February 6, 2007 Employment Verification form for Angel Mickens, signed by her, listing her employer as Southside Groceries, for Quail Valley Apts., Camilla, Georgia.

During a search of R&J Furniture, which was owned by Elbert Walker and which Alcohol, Tobacco, and Firearms Agent Thomas Greco testified was used as a storage facility for fire-damaged furniture, agents located an envelope with a return address label containing Shirley Burk's name and addressed to People's Choice Home Loan, Inc. Agents also found a receipt in Elbert Walker's name for a utility payment at 1097 Bondvilla Drive dated September 13, 2004, and a receipt in Angel Mickens' name dated October 20, 2004. And during a search of Southside Grocery, one of Elbert Walker's businesses where Shirley Burk and Angel Mickens worked, agents seized numerous documents evidencing the interconnectedness between the co-conspirators and the various schemes, including: a W2 form for Shirley Burk from Mama's Kitchen showing that it was faxed on January 12, 2006 and January 23, 2006, around the time Burk was applying for a mortgage for 1097 Bondvilla; a sheet of paper with handwritten notes listing the names of Elbert Walker, Shirley Burk, Jessie Brinner, Angel Mickens, and Novastar (Burk's and Mickens' mortgage company); various records related to Elbert Walker's financial affairs; an August 10, 2006 handwritten receipt that says "Received 300.00 From Ricky Harrison As Full Payment on Lot at 605 S. Harney Street" and lists that $200.00 had already been paid for a total of $500.00; a June 28, 2005 deed from Leroy Hall to Jessie Brinner; a May 20, 2002 deed from Elbert Walker to Roosevelt King of 410 Oak Street; a November 25, 1996 deed of 1097 Bondvilla Drive from Elbert Walker to Eddie Dixon for $10; and a December 1, 1997 deed of 1097 Bondvilla Drive from Eddie Dixon to Elbert Walker for $10.

Agents seized even more evidence of the relationships between the co-conspirators from Elbert Walker's residence on Bay Tree Road, including: a transcript of Eddie Dixon's deposition taken on May 6, 1997 in connection with the fire at 1097 Bondvilla Drive; an AllTel bill in Eddie Dixon's name dated May 29, 1997; an Alltel letter to (Darryl) Wayne Burks dated October 28, 1999; a letter to Shirley Burk from Georgia Underwriting Association regarding a December 6, 2003 fire loss at 3841 New Hope Rd., Pelham, GA; a bill to Mama's Kitchen from Curtis Packing Co. for food delivery dated August 8, 2003; a business card for Northside Home Remodeling that says "Ask for Mr. Walker"; an August 15, 2001 warranty deed from Elbert Walker to Shirley Burk of property at 601 1st Avenue, which was Darryl Burk's address at the time law enforcement conducted searches in connection with this case; a deed of 601 1st Avenue from James Parker to Walker dated May 31, 2001; a letter addressed to Shirley Burk at 1097 Bondvilla Drive from Clyatt, Clyatt, and Golden P.C. postmarked June 1, 2006; a Zockrock Auto Repair receipt; a handwritten note with Tomeka McIntyre's name and number; proof of insurance from Monroe Pogue Insurance Agency addressed to Shirley Burke at 1097 Bondvilla Drive; a handwritten sheet that reads "Members Only," "11-9-97" and lists Tomeka McIntyre's name; "1994 E-Z Legal Forms" bankruptcy forms with Mildred Walker and Benjamin Norwood's names on them; Shirley Burk's civil complaint against Winn Dixie, notarized March 10, 2006; an unsigned land sales contract between Bridget Harrison and Angel Mickens for 605 S. Harney Street listing $89,000 as the purchase price and $5,000 paid on March 31, 2006; an unsigned handwritten notice of authorization from Ben Vicks for Angel Mickens to sign documents on his behalf, dated September 20, 2006; a letter from Carlock, Copeland to Shirley Burke postmarked January 8, 2007; a letter from McCurdy & Candler, LLC to Angel Mickens at 605 S. Harney Street, postmarked January 12, 2007; an unsigned Chapter 13 bankruptcy document with Angel Mickens' name on it; a Grady Electric Membership Corp. document dated November 18, 2005 with Shirley Burk's signature; a Mitchell County Electric bill to Angel Mickens, dated February 5, 2007; checks made out to Darryl and Shirley Burk from 2001; a check register listing payments to Darryl Burk; 1997 letters to Eddie Dixon from State Farm Insurance re-

garding the 1097 Bondvilla Drive fire; Eddie Dixon's statement of loss from the 1097 Bondvilla fire.

The Court lists the preceding evidence as examples of the interconnection of the various spokes of the charged conspiracy. Particularly related to Darryl Burk, who is charged with substantially less conspiratorial conduct in the Indictment than his co-Defendants, the Court finds that his involvement in the charged conspiracy as a whole was substantial. The fact that documents relating to other co-conspirators' overt acts were found in his home is evidence that his involvement was more than simply picking up a stamp for Elbert Walker and obtaining insurance on a mobile home and submitting a fire loss claim for that mobile home. Darryl Burk was involved with Northside Home Remodeling, which submitted fire loss repair estimates to insurance companies in connection with several of the alleged arsons, and documents related to Shirley Burk's and Angel Micken's alleged conspiratorial conduct were located at Darryl Burk's home. Overall, the Government's evidence supports a finding that the charged schemes involved common participants, namely Elbert Walker, Darryl Burk, and Shirley Burk. *Berger*, 224 F.3d at 115.

The Government's evidence also supports a finding that the charged schemes were interdependent. The court in *Berger* found that where fraudulent documents from one scheme supported frauds in other schemes, interdependence was demonstrated. *Id.* Here, the Essex Insurance check, which was forged and negotiated by Walker with the use of the stamp purchased by Darryl Burk, was a payment for the fire loss at 410 Oak Street, where Shirley Burk was a tenant. Elbert Walker's false statements before Judge Lawson in 2010 were in relation to the application of the Essex Insurance check to his SGE Mortgage on 1097 Bondvilla Drive. Separately, Darrell Plymel testified that Ernest Rogers came to his package store with a check dated October 20, 2008 that appeared to be from Foremost Insurance Company in the amount of $24,689.42 and read "Fire Loss." Plymel testified that the check was a bad check and did not clear. Attorney Ronald Bruce Warren testified that Shirley Burk was a client of his and that he handled the disbursement of a check for $22,000 from Foremost Insurance Company to her and the law firm dated January 29, 2008. That check also read "Fire Loss." A reasonable jury could find that Shirley Burk's Foremost check

was used to create a counterfeit check for Ernest Rogers. Furthermore, the evidence showed the same proof of loss forms were submitted to various insurance companies by different co-conspirators in relation to the various charged fires and the same "1994 EZ Legal Forms" were used to prepare bankruptcy documents for several co-conspirators'. The Court finds that a reasonable jury could have found beyond a reasonable doubt that the spokes of the alleged conspiracy were interdependent.

This case is distinguishable from *Chandler* and *United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978), a Third Circuit case cited in *Chandler* and other Eleventh Circuit opinions, because in *Chandler* and *Pearlstein*, the individuals in the spokes were unaware of any unlawful aspect of their actions. *See Developments in the Law—Criminal Conspiracy*, 72 Harv. L.Rev. 920, 930 (1959) ("Clearly, [the illegal object] cannot be the object unless it is known to both parties."). In *Chandler*, the individuals who redeemed McDonald's game tokens did not know those tokens were stolen. 388 F.3d at 800. In *Pearlstein*, a case in which pen distributorship salesmen were convicted of participating in a mail fraud scheme, the salesmen's convictions were reversed because the Third Circuit concluded that none of the salesmen knew of the fraudulent nature of the pen company and that the company heads alone had devised the scheme. The court found that even though the salesmen had made some misrepresentations they devised themselves, there was no evidence a reasonable jury could rely on that the salesmen knew they were a part of a fraudulent scheme.

Here, however, a reasonable jury could find beyond a reasonable doubt that the spokes were aware of the unlawful aspects of their actions. A reasonable jury could find that when Darryl Burk made a fire loss claim for the contents of the Baggs Ferry Road mobile home, he knew or should have known that the contents of the home belonged to Tomeka McIntyre and that the claim itself was fraudulent because the fire was intentionally set. A reasonable jury could find, based on the evidence of Darryl Burk's connection to Shirley Burk's previous fire loss claims, including Farrell Whiddon's business card found in Darryl's home, that he was aware of the scheme to set properties on fire and then make insurance claims for the fire loss. And a reasonable jury could find that Darryl Burk purchased a stamp

24

reading "SGE Mortgage Corp." and should have known that the stamp was not intended to be used for a lawful purpose.

Likewise, a reasonable jury could find that Shirley Burk knew when her residences suffered fire damage time after time, that the fires were not accidents, especially where the Government presented expert evidence that the fires were, indeed, intentionally set by someone. A reasonable jury could also find that Shirley Burk lied on insurance applications and that her fire loss claims were fraudulent because she knew the fires were intentionally set. And a reasonable jury could find that Shirley Burk knew that the money orders fabricated to evidence earnest money she never paid to Elbert Walker were unlawful. The evidence presented at trial shows that Elbert Walker was the principal of the conspiracy alleged, but a reasonable jury could also find that it shows that Darryl Burk and Shirley Burk acted with knowledge of the unlawfulness of their actions and the related actions of others. They were not the unaware McDonald's game token redeemers or pen salesmen. Their long-term involvement with Elbert Walker belies the suggestion that they were unaware of the nature of their own actions even if they were acting at the direction of Walker.

Additionally, the fact that the jury found different conspiratorial objects as to each Defendant does not indicate that the jury, in fact, found three separate conspiracies rather than a single, unified conspiracy. As the Eighth Circuit explained in a drug distribution case,

> This Court has consistently held that where an indictment charges defendants with conspiring to distribute one or more drugs, only one of the drugs needs to be proved . . . Moreover, the fact that the jury concluded that each defendant handled different combinations of drugs does not mean that there was not one overall conspiracy to distribute cocaine-related products . . . The jury's guilty verdicts reflect its conclusion that the defendants participated in different ways in one overall conspiracy.

*United States v. Turner*, 975 F.2d 490, 493-94 (8th Cir. 1992) (internal citations omitted). Likewise, the Second Circuit held, "[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990). Further, a conspiracy count charging multiple objects will not be overturned simply "because one of the possible bases

of conviction was . . .  unsupported by sufficient evidence." *Griffin v. United States*, 502 U.S. 46, 56 (1991).

The Court concludes that, even though the jury did not find the same combination of illegal objects as to all three Defendants, a reasonable jury could still have found a single conspiracy based on the Government's evidence. The Court further concludes that a reasonable jury could find based on the Government's evidence that a single, unified conspiracy existed between the co-Defendants and their other co-conspirators.

Elbert Walker and Shirley Burk also explicitly argue that the Government did not present sufficient evidence of a conspiratorial agreement. "The Government may show participation in the conspiracy by circumstantial evidence, if not by direct evidence . . . ." *United States v. Pineiro*, 389 F.3d 1359, 1368 (11th Cir. 2004) (citing *United States v. Anderson*, 326 F.3d 1319, 1329 (11th Cir. 2003)). The Court finds based on all of the above-described evidence of the interconnectedness between the co-conspirators and their unlawful actions that a reasonable jury could find beyond a reasonable doubt based on circumstantial evidence that each Defendant entered into a conspiratorial agreement as charged.

> 2. *Whether a Reasonable Jury Could Find that the Single, Unified Conspiracy as Alleged Occurred within the Applicable Statutes of Limitations*

At the Rule 29 motions hearing, all three Defendants argued that no reasonable jury could find that the Count One conspiracy occurred within the applicable statutes of limitations. The statute of limitations for a conspiracy requiring proof of an overt act, such as § 371 conspiracies, including conspiracy to commit bankruptcy fraud, possessing a forged security or implement for making a forged security, and making false statement to a court, begins to run on the date of the last overt act committed in furtherance of the crime or crimes found to be the object of the conspiracy. *Grunewald v. United States*, 353 U.S. 391, 397 (1957); *United States v. Davis*, 533 F.2d 921, 928 (5th Cir. 1976). In considering the issue with regard to a § 371 conspiracy, the Fifth Circuit held, ". . . the government in order to avoid the bar of the limitation period . . . must show the existence of the conspiracy within the five years prior to the return of the indictment, and must allege and prove the commission of at least one overt act by one of the conspirators within that period in furtherance of the conspirato-

rial agreement." *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976). Only overt acts al-
leged in the indictment and proven at trial can mark the start of the statute of limitations
clock. *United States v. Dynalectric Co.*, 859 F.2d 1559, 1564 n. 6 (11th Cir.1988), *cert. denied*, 490
U.S. 1006 (1989) ("If an overt act is necessary, then the indictment must charge and the evi-
dence at trial must show that an overt act in furtherance of the conspiracy was made in the
limitation period.").

However, for conspiracies that do not require proof of an overt act, such as § 1349
conspiracies, including bank fraud, mail fraud, and wire fraud, and conspiracy to commit ar-
son, § 844(n), the Government need only prove "that the conspiracy continued into the limi-
tations period." *United States v. Harriston*, 329 F.3d 779, 783 (11th Cir. 2003); *United States v.
Eason*, 579 F. App'x 807, 810 n.3 (11th Cir. 2014). The Eleventh Circuit explained that in
conspiracies where no overt act is required to be proven,

> A conspiracy is deemed to have continued as long as the purposes of the con-
> spiracy have neither been abandoned nor accomplished and the defendant has
> not made an affirmative showing that the conspiracy has terminated . . . A de-
> fendant can overcome this presumption of continued participation only by
> showing that he affirmatively withdrew from the conspiracy or that the final
> act in furtherance of the conspiracy has occurred.

*Harriston*, 329 F.3d at 783 (citations omitted).  As noted earlier, the Court, without objection
from any Party, instructed the jury that proof of an overt act was required as to all of the un-
lawful objects. (Doc. 262 at 11-12.)

The statutes of limitations for the crimes of bank fraud, mail fraud affecting a finan-
cial institution, wire fraud affecting a financial institution, and arson run for ten years. 18
U.S.C. §§ 3293, 3295. The statute of limitations for the crimes of bankruptcy fraud, posses-
sion of forged security or implement for making a forged security, false declarations before a
court, mail fraud not affecting a financial institution, and wire fraud not affecting a financial
institution runs for five years. 18 U.S.C. § 3282.

a.  <u>Darryl Burk</u>

The Court has already concluded that a reasonably jury can find both a single, unified
conspiracy with multiple illegal objects and also different combinations of illegal objects as

to each Defendant. Here, the jury found a single, unified conspiracy and that Darryl Burk entered into that conspiracy but conspired only to commit mail fraud. As a matter of law, the Government had to prove that the § 1349 conspiracy to commit mail fraud continued into the statute of limitations period. However, because the jury was instructed, without objection from the Parties, that the Government was required to prove that at least one overt act in furtherance of the mail fraud conspiracy occurred within the statute of limitations, the Court will also consider whether a reasonable jury could have so found.

First, the Court finds that a reasonable jury could have found that the conspiracy to commit mail fraud continued into both the five-year and ten-year limitations periods, regardless of which is applicable. Within the ten-year period, both Shirley Burk and Angel Mickens obtained mortgages through fraud; a fire occurred at Bondvilla Drive and Shirley Burk made an insurance claim; Shirley Burk presented a counterfeit $3,600 check for cashing; and, a fire occurred at Ernest Roger's house on Oak Circle after Roger's obtained insurance on the house. And within the five-year limitations period, Ernest Rogers presented a counterfeit check purporting to be from Foremost Insurance and Elbert Walker made false statements to a court about the $45,000 Essex Insurance check in connection with a federal lawsuit he filed regarding his SGE mortgages. The Court finds that Darryl Burk presented no evidence to overcome the presumption of his continued participation or to show that he affirmatively withdrew from the conspiracy.

Furthermore, the Court finds that even a reasonable jury looking for overt acts in furtherance of the mail fraud conspiracy could have found that at least one occurred within either the ten- or five-year statutes of limitations. A reasonable jury could find that any of the acts listed above occurred in furtherance of the overall conspiracy. Specifically, as to Elbert Walker's false statements during his federal lawsuit, those false statements related to his receipt of the $45,000 check from Essex Insurance, which he tried to negotiate using the stamp acquired by Darryl Burk. (Gov't Ex. D-1-d-3 at 15 (answering "No, sir." when asked by Judge Lawson if he received a $45,000 check from the insurance company and cashed it).) Where an alleged goal of the conspiracy was to prevent the conspiracy from being exposed, the Court finds that a reasonable jury could find that these actions were reasonably foreseea-

ble by Darryl Burk and that they were committed in furtherance of the overall conspiracy, including the mail fraud object, within at least five-years of the Indictment. (Doc. 44 at 3 ("It was further an object of the conspiracy to prevent the conspiracy from being exposed to law enforcement officials and to agents of the insurance companies.").) Finally, the Court notes that all of the above-identified overt acts occurred after 2002, when 18 U.S.C. § 1349 was enacted. For those reasons, Darryl Burk's Motion for Judgment of Acquittal (Doc. 269) as to Count One is **DENIED**.

b. Shirley Burk

Shirley Burk was convicted of conspiring to commit arson, mail fraud, and false declarations to a court. The Court adopts its findings as to Darryl Burk's statute of limitations argument as to Shirley Burk's conviction for conspiracy to commit mail fraud, and finds that a reasonable jury could find both that the mail fraud conspiracy Shirley Burk participated in continued into the limitations period and that an overt act in furtherance of that conspiracy, though one was not required to be proven, occurred within five years of the Indictment.

Conspiracy to make false declarations to a court is a § 371 conspiracy requiring proof of an overt act. A reasonable jury could find that Elbert Walker's false declarations to Judge Lawson on January 4, 2010 were an overt act in furtherance of that conspiracy and that the statements were made within the applicable five-year statute of limitations. The Court further finds that where an object of the overall conspiracy was to prevent its exposure, these actions by Elbert Walker, which related specifically to the mortgage of 1097 Bondvilla where Shirley Burk lived multiple times and which she eventually purchased, were reasonably foreseeable to Shirley Burk. Alternatively, had the jury been instructed that no overt act was required to be proven, the evidence supports a finding that the conspiracy continued into the limitations period, and Shirley Burk presented no evidence that she affirmatively withdrew from the conspiracy, and the evidence in the record otherwise fails to show that she withdrew.

Furthermore, a reasonable jury could find that the 2006 Bondvilla Drive and Oak Circle fires and the activities surrounding those fires, such as the insurance claim made by Burk herself, were overt acts in furtherance of the conspiracy occurring within the ten-year

statute of limitations for conspiracy to commit arson. The Court notes that the Government's expert witnesses testified that they concluded that those fires were both intentionally set. Alternatively, had the jury been instructed properly, the evidence supports a finding that the conspiracy to commit arson continued into the limitations period, and Shirley Burk presented no evidence that she affirmatively withdrew from it, and the evidence in the record otherwise fails to show that she withdrew.

For those reasons, Shirley Burk's Motion for Judgment of Acquittal as to Count One is **DENIED**.

c.   Elbert Walker

Elbert Walker was convicted of conspiracy to commit arson, mail fraud, wire fraud, bankruptcy fraud, possession of a forged security and implement for making a forged security, bank fraud, and false declarations before a court. The Court has already noted that the evidence shows that Elbert Walker was the hub of the conspiracy. The Court adopts its findings as to Darryl and Shirley Burk with regard to the statutes of limitations for conspiracy to commit arson, mail fraud, and false declarations before a court.

Bank fraud and wire fraud conspiracies fall under 18 U.S.C. § 1349 and do not require proof of an overt act. The Government presented evidence of conspiracy to commit bank fraud that included evidence relating to the various counterfeit and forged checks that individuals in the conspiracy attempted to cash or deposit. The most recent of those was Ernest Roger's attempt to cash a counterfeit check at Plymel Package Store in 2008, which would fall within the ten-year statute of limitations for bank fraud. The Court finds that a reasonable jury could find based on the evidence that Ernest Rogers was a co-conspirator of Elbert Walker's and that his attempt to cash this counterfeit was both an overt act in furtherance of the conspiracy to commit bank fraud and also evidence that the conspiracy continued into the limitations period.

Likewise, the Government presented evidence of numerous uses of wires – telephones, emails, and faxes –throughout the course of the conspiracy. For example, Michelle Spooner testified that she and Elbert Walker faxed what a reasonable jury could find were documents containing false statements in support of Shirley Burk's and Angel

Micken's mortgage applications in 2006. This example of wire fraud affected a financial institution as defined under 18 U.S.C. § 20 –a mortgage lender. However, as the Court previously noted, the jury was instructed, without objection from any Party, that a financial institution includes only "any bank or savings association the deposits of which are insured by the Federal Deposit Insurance Corporation." (Doc. 262 at 21.) Therefore, based on the instructions given, the jury could not have found that People's Choice Mortgage was a "financial institution" triggering the ten-year statute of limitations. However, Michelle Spooner testified about the involvement of SunTrust Bank and Bank of America in securing and evidencing the payment of earnest money for the purchase of Angel Micken's home in 2006. Spooner testified that Elbert Walker was present at the closing, and the Government presented evidence that SunTrust and Bank of America were insured by the FDIC. The Court finds that a reasonable jury could conclude that Elbert Walker engaged in wire fraud affecting a financial institution and that the conspiracy continued into the limitations period and also that overt acts in furtherance of that conspiracy, though not required to be proven, were committed within the limitations period.

Additionally, the Government introduced a SunTrust Bank affidavit of a fraudulent transaction related to the forged Essex Insurance check. The Essex Insurance check was ultimately issued after Elbert Walker caused Cassandra Montgomery to fax his fire loss claim for the 2000 410 Oak Street fire. The Court finds that a reasonable jury could find based on the evidence related to the Essex Insurance check that Elbert Walker conspired to commit wire fraud affecting SunTrust Bank, a financial institution. The Court further finds that a reasonable jury could find that Elbert Walker's making false statements to Judge Lawson in 2010 both constituted an overt act in furtherance of this conspiracy and showed that the conspiracy continued into the statute of limitations period.

Conspiring to commit bankruptcy fraud and to possess a forged security or implement for making a forged security are both 18 U.S.C. § 371 conspiracies that require proof of an overt act and have a five-year statute of limitations. As to conspiracy to possess a counterfeit or forged security or implement for making a counterfeit or forged security, the Court finds that there is ample evidence relating to the forgery of the Essex Insurance check

with the use of the stamp purchased by Darryl Burk in 2002 to support a finding that Elbert Walker entered into such a conspiracy. As the Court has already noted, the jury could also have found beyond a reasonable doubt that Shirley Burk's attempt to cash a $3,600 counterfeit check dated December 4, 2006, Ernest Roger's attempt to cash a counterfeit check at Plymel Package Store in 2008, and Elbert Walker's 2010 false statement to Judge Lawson regarding his receipt and cashing of this check were overt acts in furtherance of the conspiracy to possess a counterfeit or forged security or implement for making a counterfeit or forged security. The Court finds that the jury could have found beyond a reasonable doubt that these overt acts involved "counterfeit" or "forged" "securities" as defined by the Court and that the counterfeit securities were for a real or fictional "organization" as defined by the Court. (Doc. 262 at 18-19.) The 2008 and 2010 overt acts occurred within the five-year statute of limitations.

Finally, a jury could find that Elbert Walker conspired to commit bankruptcy fraud. His most recent attempt to do so would have been his 2007 involvement in the preparation of Angel Mickens' bankruptcy forms in an attempt to avoid foreclosure on her home at 605 S. Harney Street. Though the Government did not introduce evidence that these forms were ever filed, the Government is not required to prove the successful completion of the conspiratorial object. *See Iannelli*, 420 U.S. at 777. Further, the Government introduced evidence of several other bankruptcy filings Elbert Walker made in 1996 and 2005 and one that Elbert's wife and alleged co-conspirator, Mildred, made in 1999, to shield property securing SGE mortgages from foreclosure. A reasonable jury could find based on the evidence that the 2005 bankruptcy filing in particular contained false statements such as listing that 1097 Bondvilla was Walker's primary residence. Walker referenced these bankruptcy filings in his federal complaint against Hall, Bloch, Garland, and Meyer and SGE Mortgage, filed in 2009. (*See* Gov't Ex. D-1-d-1.) The Court finds that a reasonable jury could conclude that Walker's filing this lawsuit and making false statements in relation to the Essex Insurance check that was intended to be a payment to SGE Mortgage were overt acts made in furtherance of his conspiracy to commit bankruptcy fraud and within the five-year limitations period, particu-

larly where avoiding detection by law enforcement and insurance companies is charged as a goal of the conspiracy.

In summary, the Court finds that a reasonable jury could have found beyond a reasonable doubt that Elbert Walker engaged in a conspiracy to commit arson, mail fraud, wire fraud, bankruptcy fraud, possession of a forged security and implement for making a forged security, bank fraud, and false declarations before a court and that these conspiracies continued into the governing limitations periods and also that overt acts in furtherance of these conspiracies were committed within the governing limitations periods. Walker's Motion for Judgment of Acquittal as to Count One (Doc. 268) is therefore **DENIED**.

## III.   Elbert Walker's Counts Two and Four Charges for Possession of a Firearm by a Felon

The jury found Elbert Walker guilty of Counts Two and Four, which both charged possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). The Court finds that a reasonable jury could have found based on the evidence presented that Elbert Walker was a felon convicted of a crime punishable by imprisonment for more than one year. To prove Walker's conviction, the Government introduced a certified copy of the docket from a state court case in Atlantic County, New Jersey. That docket lists a defendant named Elbert Walker who is charged with, among other crimes, "welfare conspiracy," states that a guilty verdict was returned against Elbert Walker as to multiple counts on June 29, 1976, and reads,

> Sentence: Defendant WALKER committed to the New Jersey State Prison, for a term of not less than two and no more than three years on counts 1 thru 7, counts 12 thru 26, and counts 28 thru 33, sentence to run concurrently and not consecutively; not less than 1 and no more than 2 years on the 34th count, sentence to run consecutively and not concurrently to the sentence on the first count . . . .

(Gov't Ex. 1 at 5-6.) The Government also called expert witnesses Andrew McIntyre and George Godfrey who compared fingerprint records from New Jersey listing the name "Elbert Walker," a charge of "welfare fraud," and the date June 18, 1974 with fingerprints taken in Georgia, including one set taken at the Grady County, Georgia Detention Center on December 19, 2011 from an Elbert Walker. Officer Rashawn Williams, from the Grady County Detention Center, identified Elbert Walker in the courtroom and recalled seeing him in the

33

facility though he did not recall taking Walker's fingerprints. McIntyre and Godfrey conclud-ed that the New Jersey "Elbert Walker" fingerprints matched the Grady County "Elbert Walker" fingerprints. Additionally, the fingerprint cards listed the same birth date for the fingerprint subject and the New Jersey card listed "Mildred Walker" as Elbert's spouse.

Walker argued during the Rule 29 motions hearing that the evidence was insufficient to establish a felony conviction and that he was not the Elbert Walker named in the New Jersey case record. Neither Walker nor the Government could cite to any applicable federal law establishing what kind of evidence may be considered as proof of a conviction; however, the Government cited a New Jersey statute, which the Court finds persuasive, that allows a prior conviction to be proven for sentencing considerations by "any evidence, including fin-gerprint records made in connection with arrest, conviction, or imprisonment . . ." N.J.S.A. § 2C:44-4(d). The Court finds that a reasonable jury could conclude, based on the evidence presented, that the Elbert Walker on trial in the above-styled case was the same Elbert Walk-er convicted of a crime punishable by more than one year in a New Jersey state court in 1974.

The Court notes that Elbert Walker did not challenge the sufficiency of the evidence of his alleged possession of the firearms listed in the Indictment or the firearms' connection to interstate commerce. However, the Court finds that a reasonable jury could find based on the testimony of Agent Rod Williams, who testified about the search of Walker's residence where all of the firearms listed in the Indictment were found, that Walker possessed the fire-arms, which were located in his bedroom. The Court also finds that a reasonable jury could find based on the testimony of Agent Ashley Lightner, an expert in interstate nexuses, that the firearms had been transported in interstate and/or foreign commerce. Walker's Motion for Judgment of Acquittal as to Counts Two and Four (Doc. 268) is therefore **DENIED**.

## IV.    Elbert Walker's Count Three Charge for Possession of a Firearm with an Obliterated Serial Number

At the Rule 29 hearing, Elbert Walker argued that the evidence presented at trial was insufficient to support a finding that he possessed the firearm named in Count Three of the Indictment. Although Walker abandoned this argument in his written Rule 29 brief (*see* Doc.

268), the Court still considers it. The Court finds that a reasonable jury could find based on the testimony of Agent Major Wells, who was qualified as an expert in firearms and tool mark examination, that the Companhia Braziliera de Cartuchos, Model 151 shotgun found at Walker's residence bore an obliterated serial number in violation of 18 U.S.C. § 922(k). The Court also finds that a reasonable jury could find based on the testimony of Rod Williams, who testified that the shotgun was seized from Walker's residence and specifically his bedroom, that Walker possessed the shotgun. And the Court finds that a reasonable jury could find beyond a reasonable doubt based on the testimony of Agent Ashley Lightner that the firearm had been transported in interstate and/or foreign commerce. Walker's Motion for Judgment of Acquittal as to Count Three is therefore **DENIED**.

## V.    Conclusion

For the reasons stated herein, all three Defendants' Motions for Judgment of Acquittal (Docs. 268, 269) are **DENIED**. The Court finds that the voluminous evidence viewed in the light most favorable to the Government supports the Defendants' respective convictions beyond a reasonable doubt.

**SO ORDERED**, this 24th day of March, 2016.

/s/ **W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**